UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| KEVIN BRICK, and MAXIM TICKETS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> The University of Michigan, <br><br> Defendant. | <br><br><br><br><br><br> TRIAL BY JURY DEMANDED |

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

Plaintiffs, Kevin Brick ("Mr. Brick") and Maxim Tickets, Inc. ("Maxim Tickets") (collectively, "Plaintiffs"), by their undersigned attorneys and as their Complaint against the University of Michigan ("UM"), state:

**INTRODUCTION**

1. This is an action for UM's violations of Michigan's Consumer Protection Act ("MCPA"), MCL 445.901 *et seq.,* Michigan's Freedom of Information Act ("FOIA"), MCL 15.231 *et seq.*, and Michigan common law.

2. UM engaged in unfair, unconscionable, and deceptive business practices under the MCPA when it deceived and misled Plaintiffs into: (a) donating millions of dollars to UM and its Athletic Department and (b) purchasing hundreds of thousands if not millions of dollars in season tickets for football over the course of 21 years, only to abruptly change without notice the terms and conditions purportedly applicable to said season tickets and then summarily cancel Plaintiffs' ticket accounts in February of this year, costing Maxim Tickets between $2.5 million and $3.5 million in revenue per year, and depriving Mr. Brick of the use and enjoyment of the same.

1

3. More specifically, to induce Plaintiffs and others into paying for football season tickets and "donating" additional monies in the form of minimal Preferred Seat Contributions ("PSC") and otherwise each year, UM represented to football season ticket holders that: (a) they would have access to the same seats the following season; and (b) their participation in a Priority Points Program ("PPP") -- whereby season ticket holders like Plaintiffs would earn Priority Points according to factors such as years as season ticket holders and the total dollar amounts of their donations to UM would afford them access to seat upgrades and additional season tickets *for the following* year. In other words, UM represented to Plaintiffs and others that their access to future season tickets would be based on the number of Priority Points the football season ticket holder amassed prior to that season.

4. Despite UM's longstanding policy of allowing resale and transfer of football season's tickets, on information and belief it unilaterally changed its terms and conditions without Plaintiffs' consent or knowledge in around 2023, effectively voiding the Priority Points Plaintiffs gained over numerous years from millions of dollars of donations, and cancelled their season tickets for failure to comply with the new terms.

5. UM also cancelled Mr. Brick's individual account, even though he did not violate the new terms and conditions purportedly applicable to his season tickets.

6. When counsel for Plaintiffs submitted FOIA requests to UM to obtain public records pertaining to UM's (a) past terms and conditions allegedly applicable to the football season tickets, and (b) representations about PSC and PPP, UM arbitrarily denied such requests and continues to unlawfully withhold such records. UM's refusal to comply with FOIA has made it virtually impossible for Plaintiffs to ascertain the terms, conditions, and policies (collectively, "T&C") allegedly applicable to their season ticket accounts.

2

## PARTIES

7. Maxim Tickets is a corporation incorporated in North Carolina, with its principal place of business in Charlotte, North Carolina. It is primarily a ticket reseller.

8. Kevin Brick was, at all relevant times, an individual season ticket holder of UM football, the President of Maxim, and a resident of Charlotte, North Carolina.

9. Defendant UM is a public university organized and existing under the laws of the State of Michigan, with its principal place of business in Ann Arbor, Michigan.

## JURISDICTION AND VENUE

10. This Court has jurisdiction under 28 U.S.C. § 1332(a)(1) as Plaintiffs and Defendant are citizens of a different state and the amount in controversy exceeds $75,000.00.

11. Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b)(2) as the acts and events giving rise to this lawsuit occurred in Washtenaw County, Michigan, which sits in the Eastern District of Michigan.

## FACTUAL BACKGROUND

*Season Tickets*

12. Maxim Tickets lawfully acquired over 1,000 of UM football season tickets over the course of 21 years. With respect to some of these season tickets, a named individual account holder would pay UM for the season tickets, and then Maxim Tickets would pay the named individual account holder for the same season tickets. In other instances, Maxim Tickets would openly pay UM directly for season tickets held in other individuals names.

13. Immediately prior to February of 2024, Maxim Tickets had lawfully acquired and/or controlled 164 accounts with 1,035 football season tickets. Mr. Brick also held football season tickets in his individual name.

14. At all relevant times, UM communicated to football season ticket holders (including Plaintiffs) and the general public that a season ticket holder would have the opportunity "to obtain their same seat year after year." A true and correct copy of an UM representation in this regard is attached hereto as Exhibit 1.[1] A true and correct copy of a similar representation is included in Exhibit 4, attached hereto.

15. Additionally, at all relevant times, UM communicated to football season ticket holders (including Plaintiffs) and the general public that season tickets were freely transferrable to others, and for a profit. A true and correct copy of one such representation is attached hereto as Exhibit 2, at p. 3.[2]

16. Similarly, at all relevant times, UM communicated to football season ticket holders (including Plaintiffs) and the general public that season tickets could be sold for profit via online ticket platforms such as StubHub and SeatGeek. A true and correct copy of an UM representation in this regard is attached hereto as Exhibit 4.

17. UM's PPP has been in place and advertised by UM for years, with Priority Points being awarded since at least 1992.

18. As set forth above, a football season ticket holder's donations to UM Athletics, including but not limited to the payment of the PSC, directly translate to Priority Points under the PPP. A true and correct copy of one version of UM's communications regarding its PPP is attached hereto as Exhibit 5.

---

[1] As set forth below, UM's failure to comply with Plaintiffs' FOIA requests has rendered them unable to ascertain precisely which communications UM made to football season ticket holders and the general public when.
[2] Another option for transfer of a football season ticket was through UM, for a fee. A true and correct copy of an UM representation regarding this option is attached hereto as Exhibit 3.

4

19. More specifically, under UM's PPP, Priority Points begin to accumulate after the first donation, with the number of Priority Points awarded varying according to the nature and extent of each donation.

20. Football season tickets and seat upgrades for the following year were then made available and allocated according to the amount of Priority Points previously amassed by the football season ticket holder. Over the course of 21 years, Plaintiffs collectively have donated millions of dollars[3] to UM in PSC and otherwise to gain Priority Points, not only effectively guaranteeing the same season tickets for the following year but also significantly improving the seat locations for, and therefore the value of, their season tickets.

21. As of January 2024, Plaintiffs had accumulated over 15,000 Priority Points. According to UM's representations on its website, Plaintiffs' accumulation of over 15,000 Priority Points was extensive and placed Plaintiffs in the highest bracket of the top 100 ranking of all-time donors.[4]

22. Other UM communications to football season ticket holders affirmed the fact that PPP donations would effectively guarantee football season tickets the following year. For example, UM football fans were not permitted to attend home games in the pandemic-shortened 2020 collegiate football season. UM therefore solicited Plaintiffs and other season ticket holders to donate the amounts they had paid for that year's season ticket, as well as the amounts of its other donations (including but not limited to PSC), to its Champions Fund in lieu of getting a refund of those amounts. In exchange, UM offered season ticket holders like Plaintiffs 100 Priority Points and a 20% discount for the PSC and season ticket value for the following season. A true and correct copy of UM's communication in this regard is attached hereto as Exhibit 6.

---

[3] As UM has locked Plaintiffs out of their former accounts, the precise amount of donations is not currently known.
[4] *See* https://support.mgoblue.com/inform/gameday/index.html

23. More specifically, in Exhibit 6, UM stated to Mr. Brick that if he donated his "2020 PSC/season ticket payments **you will receive** 100 priority points (equivalent to a $10,000 donation to Michigan Athletics) and a 20% discount for the PSC and season ticket value for the 2021 season." *Id.*

24. In reliance on this representation, which was also indirectly made to Maxim through the accounts it lawfully acquired, Plaintiffs accepted the offer and made the donations in lieu of the refund.

25. Maxim Tickets has been operating as a ticket broker with respect to UM's season tickets for many years with UM's knowledge and without objection. More specifically, UM labeled all of Maxim Tickets' accounts, though in the name of individual account holders, as "B2B" (business-to-business) accounts, which reflects UM's knowledge that the accounts were used primarily to resell tickets. Additionally, Maxim Tickets paid for many of its season tickets with credit cards labeled with its name.

26. Further, Mr. Brick has been an individual account holder for many years and personally attended games with season tickets acquired by his individual account.

27. However, on January 23, 2024, Mr. Brick received an email from UM athletics claiming that an analysis of his accounts'[5] activity suggested that he was engaged in ticket broker activity, which allegedly was now prohibited.

28. As a result, UM revoked Plaintiffs' right to any future season tickets renewal and locked their accounts, voiding the over 15,000 Priority Points Plaintiffs had accumulated by that point.

---

[5] Presumably, UM's reference to Mr. Brick's accounts included Maxim Tickets' accounts, as Mr. Brick's personal account and all of Maxim Tickets' accounts were subsequently cancelled.

29. Notably, UM's revocation included Mr. Brick's individual account even though his individual account activities did not violate the new supposed prohibitions on ticket resale activity.

30. The aforesaid action was inconsistent with the representations to Plaintiffs, football season ticket holders, and the general public set forth above, upon which Plaintiffs had repeatedly and reasonably relied over the course of 21 years, including but not limited to representations about the prospective benefits of purchasing season tickets and making donations.

31. Further, and to the extent that UM attempted to change the T&C applicable to each season ticket account to prohibit resale, it did so without Plaintiffs' consent or knowledge, effectively hiding such prohibitions from Plaintiffs while repeatedly highlighting the prospective benefits of their continuing donations via the PPP. UM then attempted to retroactively apply its new supposed restrictions on resale as the justification for revoking Plaintiffs' accounts and cancelling its tickets.

32. Further in this regard, the representations UM made about the PPP and PSC on its website do not mention, incorporate or directly point to the T&C supposedly applicable to season tickets. Instead, those T&C are effectively hidden on entirely different pages on the website.

33. On information and belief, UM has since entered into a formal or informal agreement with Eventellect, a company in Texas, or one of its affiliated entities to resell some or all of Plaintiffs' season tickets on the secondary market for a profit.

34. Additionally, on information and belief, UM surreptitiously used the new T&C to cancel season ticket accounts as a means to take higher quality football season tickets from Plaintiffs and others and then directly profit from redistributing those tickets to Eventellect or others –effectively enabling Eventellect, or one of its affiliated entities, to have 100% control over the secondary market for season tickets.

7

35. On information and belief, in cancelling such tickets but then failing to return them to the season ticket pool and make them available to existing season ticket holders who had donated via the PPP for the chance to upgrade their existing tickets, UM also violated the representations it had made to season ticket holders (including but not limited to Plaintiffs) in the PPP and elsewhere.

*FOIA Requests*

36. In an effort to seek further information as to UM's unlawful revocation/cancellation of Plaintiffs' season tickets, on March 25, 2024, counsel for Plaintiffs submitted FOIA requests to UM (the "Requests"). A true and correct copy of the Requests are attached hereto as Exhibit 7.

37. Request No. 1 sought all letters of intent, memoranda of understanding, contracts, and draft contracts between UM and Eventellect on the subject of athletic ticket reselling. *Id.*

38. Request No. 2 sought all communications between UM and actual or prospective football season ticket holders and actual or prospective preferred seat contributors. *Id.*

39. Request No. 3 sought the terms and conditions applicable to such football season tickets and/or preferred seat contributions. *Id.*

40. The applicable time period to the Requests was the last 10 years to the present. *Id.*

41. On April 2, 2024, Carolyn Ulbricht of UM's FOIA office emailed Plaintiffs' counsel requesting an extension to respond to the Requests by April 16, 2024. A true and correct copy of this email is attached hereto as Exhibit 8.

42. Subsequently on April 11, 2024, UM's FOIA officer, Shannon Hill ("Ms. Hill") responded to the Requests stating that there were no records responsive to Request No. 1 and Request No. 2 was overbroad but, upon the receipt of additional, limiting information, Ms. Hill

would proceed with processing a revised request. A true and correct copy of this response is attached hereto as Exhibit 9.

43. In response to Request No. 3, Ms. Hill stated that responsive ticket policies were outlined on Michigan Athletic web pages, which she provided four web links to. *Id.*

44. The four web-links Ms. Hill provided in response to Request No. 3 contained only general information and frequently asked questions about tickets, Priority Points calculations, and season ticket upgrades. True and correct copies of the web pages corresponding to these four links are attached as Exhibits 10, 11, 12 and 13.

45. None of the four web-links contained any information pertaining to the terms and conditions applicable to such football season tickets, the PSC and/or PPP sought by Request No. 3. The year listed at the bottom of each of the four web-links purports to be from 2024.

46. Upon information and belief, the terms and conditions of season tickets, and the PPP changed from year to year. Yet, the weblinks to the non-responsive information reflected the current status of such information and not within the requested parameters seeking such information from the past 10 years.

47. On April 19, 2024, counsel for Plaintiffs provided Ms. Hill with her requested specificity as to Request No. 2, clarifying that the Request was seeking all offers to actual or potential football season ticket holders that UM made and the terms of such offers, and all solicitations by UM for PSC for football. A true and correct copy of that communication is attached hereto as Exhibit 14.

48. In the April 19, 2024 communication, counsel for Plaintiffs additionally addressed Ms. Hill's insufficient response to Request No. 3 and requested a supplement response as none of the provided links contained the terms and conditions applicable to the identified football season

9

tickets and/or PSC, and that such links reflected the current status of such information despite the time period of the request being the past 10 years to the present. *Id.*

49. In an effort to resolve the matter, counsel for Plaintiffs informed Ms. Hill that they were willing to reduce the time frame applicable to Request Nos. 2 and 3 to the last 7 years. *Id.*

50. Subsequently on April 22, 2024, Ms. Hill asked counsel for Plaintiffs to clarify the meaning of "offers" in their supplemental specification for Request No. 2. Counsel for Plaintiffs responded that they sought UM's offers to alumni or fans to purchase and communications relating to opportunities to purchase football season tickets or preferred seat contributions and the terms associated with such offers and opportunities. A true and correct copy of that communication is attached hereto as Exhibit 15.

**Denial of FOIA Request No. 2**

51. On April 29, 2024, Ms. Hill made the final determination to deny Request No. 2. *See* Exhibit 16, attached hereto.

52. In her denial of Request No. 2, Ms. Hill stated that "[t]o the extent that responsive communication records may exist, they are not maintained in an electronically retrievable format." *Id.*

53. Ms. Hill did not assert that the Requests fall under any of the exemptions listed under FOIA. *Id.*

54. Similarly, Ms. Hill failed to provide a certificate, as required by FOIA, affirming that public records responsive to Request No. 2 do not exist. *Id.*

**Denial of FOIA Request No. 3**

55. On April 29, 2024, Ms. Hill also made the final determination to deny Request No. 3. *See* Exhibit 16.

56. In her denial of Request No. 3, Ms. Hill stated that there were no additional responsive records other than the weblinks included in her April 11, 2024, response. *Id.*

57. Ms. Hill also failed to provide a certificate, as required by FOIA, affirming that public records responsive to Request No. 3 do not exist. *Id.*

*Maxim Ticket's Appeal of the Denial of the FOIA Requests*

58. Based on UM's denial of Request Nos. 2 and 3, on May 3, 2024, counsel for Plaintiffs submitted their appeal to UM. A true and correct copy of that appeal is attached hereto as Exhibit 17.

59. On May 16, 2024, Steve Yaros, the interim chief of staff of UM's office of the president, requested an extension of 10 business days to respond to the appeal. A true and correct copy of that request is attached hereto as Exhibit 18.

60. On May 30, 2024, Mr. Yaros issued a letter to counsel for Plaintiffs denying their appeal. A true and correct copy of that denial is attached hereto as Exhibit 19.

61. Mr. Yaros provided no explanation for the appeal denial beyond stating that it was "denied for the reasons stated in Ms. Hill's response of Monday, April 19, 2024, which will not be repeated herein." *Id.*

62. On information and belief, the withheld information, documents, and communications responsive to Request Nos. 2 and 3 are properly subject to disclosure under FOIA and are being withheld unlawfully.

**COUNT I**
**VIOLATION OF CONSUMER PROTECTION ACT**

63. Plaintiffs reallege and incorporate Paragraphs 1 through 62 above as though fully set forth herein.

11

64. UM is engaged in "trade or commerce" as defined by section 445.902(g) of the MCPA.

65. UM has engaged in unfair, unconscionable, and deceptive practices in the conduct of its trade or commerce under Section 445.903(1)(g) when it advertised and represented to Plaintiffs that season tickets and seat upgrades for the upcoming football season would be made according to the amount of Priority Points one had previously accumulated in making PSC and other donations to UM, with the intent to not award season tickets as advertised and represented.

66. UM similarly engaged in unfair, unconscionable, and deceptive practices in the conduct of its trade or commerce under Section 445.903(1)(g) when it advertised and represented to Plaintiffs that they would be able to resell individual game tickets within the season tickets and transfer their season tickets to any other individual.

67. UM has also engaged in unfair, unconscionable, and deceptive practices in the conduct of its trade or commerce by failing to reveal material facts which tended to mislead and deceive Plaintiffs as prohibited by Section 445.903(1)(s) of the MCPA.

68. Specifically, UM engaged in practices prohibited by Section 445.903(1)(s) because it misled and deceived Plaintiffs when it changed its T&C applicable to Plaintiffs season tickets without Plaintiffs' consent or knowledge to prohibit season ticket resale and/or transfer knowing (or should have known) that Plaintiffs had relied on UM's prior practice of freely permitting resale and/or transfer, thus prompting Plaintiffs to donate millions of dollars over a period of time.

69. Moreover, UM engaged in misleading and deceitful practices prohibited by Section 445.903(1)(s) because the representations it made about the PPP and PSC on its website do not incorporate the new T&C supposedly applicable to season tickets acquired via the program, nor is there a direct link to the new T&C.

70. Additionally, UM engaged in practices prohibited by Section 445.903(1)(s) because it misled and deceived Mr. Brick when it purported to change the T&C applicable to Plaintiffs' season tickets to prohibit resale and wrongly apply such restriction to cancel Mr. Brick's individual account and negate the value of his donations under the PPP prior thereto.

71. UM further engaged in practices prohibited by Section 445.903(1)(s) because, on information and belief, it deceived and misled Plaintiffs and others by representing that football season tickets previously held and otherwise disposed of would then be offered to other season ticket holders in the PPP when, in actuality, UM sold those tickets either directly on the secondary market or provided them to others like Eventellect so that it could directly profit from them., and at a time when said tickets were at or near their highest historical value.

72. UM has engaged in unfair, unconscionable, and deceptive practices in the conduct of its trade or commerce by failing to reveal facts material to the transaction in light of representations of fact made in a positive manner as prohibited by Section 445.903(1)(cc) of the MCPA.

73. UM engaged in deceptive practices when it made continuous representations of fact that season ticket renewal and seat upgrades for the prospective years would be based on the amount of Priority Points accumulated prior to that season, only to assert later that such PSCs and other contributions would not apply to future seasons.

74. Specifically, UM has deceptively failed to reveal that past lawful and permitted conduct in allowing resale of season tickets would subject Maxim Tickets to revocation of future season tickets, and subject Mr. Brick's individual account to the same revocation despite not engaging in activity that violated even the new T&C.

75. As a direct and proximate result of UM's unfair and deceptive practices, Plaintiffs have suffered damages exceeding $2 million.

## COUNT II
## FRAUD

76. Plaintiffs reallege and incorporate Paragraphs 1 through 75 above as though fully set forth herein.

77. UM made material representations to Plaintiffs and other football season ticket holders via the email and website statements set forth above.

78. Not only were the above representations false when made, on information and belief, UM knew that such representations were false when made.

79. UM made such representations regarding the continuing benefits of purchasing season tickets, making donations, and permitting resale of those tickets with the intention that it would be acted upon by Plaintiffs.

80. These representations on UM's website regarding the benefits of the PPP and PSC nowhere mentioned or incorporated the T&C purporting to prohibit resale activity, nor did UM provide a direct link to such T&C.

81. Plaintiffs acted in reliance upon UM's above representations by continuously over the past 21 years purchasing season tickets and donating large sums of money to obtain the prospective benefits represented by UM.

82. As a result of Plaintiffs' reliance on UM's false representations, Plaintiffs' accumulation of priority points under the PPP via donations contributed over the years have been cancelled and rendered worthless.

## COUNT III (IN THE ALTERNATIVE)
## NEGLIGENT MISREPRESENTATION

83. Plaintiffs reallege and incorporate Paragraphs 1 through 75 above as though fully set forth herein.

84. UM negligently made the aforesaid material misrepresentations to Plaintiffs.

85. UM owed a duty to its season ticket holders, like Plaintiffs, and failed to act with reasonable care when it prepared and made the above false representations.

86. Plaintiffs justifiably relied on UM's above representations to their detriment when they continued over the past 21 years to purchase season tickets and donate millions of dollars to obtain the prospective benefits UM represented.

87. As a result of Plaintiffs' reliance on UM's representations that it made without reasonable care, the priority points accumulated over years of donations of millions of dollars have been made worthless, including those accumulated through Mr. Brick's individual account.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

88. Plaintiffs reallege and incorporate Paragraphs 1 through 75 above as though fully set forth herein.

89. As a ticket broker, Plaintiffs Maxim Tickets has a valid business relationship with its customers reselling UM's season tickets.

90. In furtherance of Plaintiffs' business relationship, Plaintiffs have donated a significant amount of money with the expectation that accumulation of such donations effectively guaranteed season tickets and an opportunity to improve seat locations for prospective years.

91. Upon information and belief, UM knew of Maxim Tickets' business relationships with customers, but at a minimum, UM was aware that the primary purpose of the accounts Maxim Tickets controlled was for resale.

92. UM intentionally interfered with Plaintiffs' valid business relationship and caused the termination of the relationship when UM unlawfully and unjustifiably revoked and locked Plaintiffs' 164 accounts that held 1,035 season tickets.

93. As a result of UM's intentional interference with Plaintiffs' valid business relationships, Plaintiffs have suffered damages exceeding $2 million.

## COUNT V
## BREACH OF IMPLIED CONTRACT/UNJUST ENRICHMENT

94. Plaintiffs reallege and incorporate Paragraphs 1 through 75 as though fully set forth herein.

95. Alternatively, UM and Plaintiffs had an implied contract based on UM's representations as aforesaid.

96. Plaintiffs relied on UM's representations about the prospective benefits of making donations and Plaintiffs' right to resell their season tickets.

97. By revoking Plaintiffs right to future season ticket renewal based on a retroactive application of a new rule prohibiting resale, UM made the thousands of points accumulated from years of donations worthless, and thus breached the implied contractual obligations.

98. Further, UM's revocation of Mr. Brick's individual account based on retroactive application of its new rule prohibiting resale unjustly enriched UM at Mr. Brick's expense as his individual account activity did not violate even any of the new T&C.

99. As a result of UM's breach, UM has been unjustly enriched at Plaintiff's expense and has retained the benefit of years' worth of Plaintiffs' donations while revoking Plaintiffs' season tickets and refusing to permit Plaintiffs to transfer the tickets for the upcoming season.

100. UM's breach of the implied contract has caused Plaintiffs to suffer damages exceeding $2 million.

## COUNT VI
## VIOLATION OF THE FREEDOM OF INFORMATION ACT

101. Plaintiffs reallege and incorporate Paragraphs 1 through 75 as though fully set forth herein.

102. A public body has a duty under FOIA to provide access to nonexempt records. MCL § 15.231.

103. UM is a "public body" subject to the requirements of FOIA as defined by MCL § 15.232(h).

104. The documents, communications, and information sought by Request No. 2 are "public records" as defined by MCL § 15.232(i) and are thus subject to disclosure.

105. "Public records" under FOIA included a writing or other means of recording. MCL § 15.232(l).

106. The documents, communications, and information sought by Request No. 2 do not fall under any of the exemptions set forth in MCL § 15.243 precluding disclosure, nor has UM asserted that such records are exempt.

107. UM's denial of Request No. 2 on the basis that such records are not maintained in an electronically retrievable format is not a proper reason under FOIA for withholding such documents.

108. There is no requirement under FOIA that public records subject to disclosure are limited to those in an electronically retrievable format.

109. Accordingly, UM has violated FOIA by unlawfully withholding the public records responsive to Request No. 2.

## COUNT VII
## VIOLATION OF THE FREEDOM OF INFORMATION ACT

110. Plaintiffs reallege and incorporate Paragraphs 1 through 75 as though fully set forth herein.

111. A public body has a duty under FOIA to provide access to nonexempt records. MCL § 15.231.

112. UM is a "public body" subject to the requirements of FOIA as defined by MCL § 15.232(h).

113. The documents, communications, and information sought by Request No. 3 are "public records" as defined by MCL § 15.232(i) and thus are subject to disclosure.

114. The documents, communications, and information sought by Request No. 3 do not fall under any of the exemptions set forth in MCL § 15.243 precluding disclosure, nor has UM asserted that such records are exempt.

115. In response to Request No. 3 seeking the terms and conditions applicable to football season tickets and preferred seat contributions from the past 7-10 years, UM asserts that no responsive records exist besides four web links to the current status of non-responsive information, despite the fact that the terms and conditions applicable to season tickets and preferred seat contributions have changed from year to year.

116. Accordingly, UM has violated FOIA by unlawfully withholding public records responsive to Request No. 3.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs Kevin Brick and Maxim Tickets, Inc. respectfully request this Court to: (1) enter judgment in favor of Plaintiffs and against Defendant UM for its violations of the MCPA, common law Fraud (or in the alternative, negligent misrepresentation), Intentional Interference with Prospective Business Advantage, and Breach of Implied Contract/Unjust Enrichment, and award Plaintiffs damages in excess of $2,000,000; (2) Pursuant to MCL § 15.240(6), award Plaintiffs the amount of their reasonable attorneys' fees and costs incurred in bringing this action; (3) award Plaintiffs punitive damages in an amount to be determined at trial for Defendant's violations of Counts II (or in the alternative, III), and IV; (4) Order Defendant to provide all documents sought in FOIA Request Nos. 2 and 3; (5) pursuant to MCL § 15.240(7), award Plaintiffs punitive damages for Defendant's arbitrary and capricious withholding of records; and (6) Award Plaintiffs any other relief in their favor as this Court deems just and proper.

Respectfully submitted,

KEVIN BRICK and MAXIM TICKETS, INC.,

By: /s/ Eric S. Rein
    One of their attorneys

Eric S. Rein
Kilpatrick Townsend & Stockton LLP
500 West Madison Street, Suite 3700
Chicago, IL 60661
**Direct:** (312) 606-3227
**Fax:** (312) 267-2240
rrein@ktslaw.com

Robert H. Smeltzer *pro hac pending*
Ashleigh A. Stochel *pro hac pending*
Alyssa Friedman *pro hac pending*
Kilpatrick Townsend & Stockton, LLP
175 W. Jackson Blvd, Suite 950
Chicago, Illinois 60604
(312) 364-2500 - Phone
rsmeltzer@ktslaw.com
astochel@ktslaw.com
afriedman@ktslaw.com

30081893V.1

20